UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JOSIAH L.[1],                                    )
                                                 )
            Plaintiff,                           )
                                                 )
     v.                                          )        CIVIL NO.  1:21cv226
                                                 )
KILOLO KIJAKAZI, Acting                          )
Commissioner of Social Security,                 )
                                                 )
            Defendant.                           )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Supplemental
Security Income (SSI) as provided for in Title XVI of the Social Security Act.  Section 405(g) of
the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy
of the transcript of the record including the evidence upon which the findings and decision
complained of are based.  The court shall have the power to enter, upon the pleadings and
transcript of the record, a judgment affirming, modifying, or reversing the decision of the
[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he
findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be
conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to last for a continuous period of not less
than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

_____

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings. *Scott v. Astrue*, 734, 739 (7th Cir. 2011); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see also Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 13, 2019, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: epilepsy; attention deficit hyperactivity disorder (ADHD); and cognitive disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations. He can never climb ladders, ropes, or scaffolds; occasionally climb stairs, and balance. He would need to avoid all work at unprotected heights, avoid operation of motorized vehicles, and avoid work around or the operation of dangerous machinery, with moving parts or sharp brakes. He can understand, carry out, and remember simple, routine, and repetitive tasks with no production rate pace, like assembly-line work. He can meet production requirements that allow a flexible and goal-oriented pace. He can perform work requiring only simple work-related decision-making. He can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods. He could respond appropriately to predictable, routine changes in the workplace. He could have brief and superficial interaction with supervisors and coworkers defined as occasional interaction with supervisors apart from what is necessary for general instruction, task completion, or training, and occasional interaction with coworkers. He could have occasional interaction with the general public. The frequency of seizures would not cause the claimant to miss more than two days of work per month.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on October 8, 2000 and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     Therefore, the undersigned finds that the claimant has not been under a disability, as defined in the Social Security Act, since January 13, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 12-21).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on November 12, 2021. On December 9, 2021, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on December 23, 2021. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born in 2000 and was seven years old on the date of his alleged onset of disability. (Tr. 94). Plaintiff's highest level of education is completion of eleventh grade. He received special education services at school. (Tr. 185).

Plaintiff's primary treating neurologist, Marlene C. Bultemeyer, M.D., of the Fort Wayne

4

Neurological Center, manages Plaintiff's medications, including anticonvulsants Banzel, Depakote, and Vimpat for epilepsy, and Lorazepam for seizure rescue. (Tr. 534). Plaintiff also takes Intuniv to treat attention deficit hyperactivity disorder. (*Id*.). On January 18, 2018, Dr. Bultemeyer opined a recent increase in Plaintiff's seizures may relate to sleep cycle disruption. (Tr. 537). On September 6, 2018, Dr. Bultemeyer observed Plaintiff had recently been found on the school bathroom floor after having a single generalized tonic clonic seizure. (Tr. 530). She noted Plaintiff takes a "full day" to recover from a seizure. (*Id*.). Plaintiff presented to the Parkview ER on February 18, 2019, following a cluster of grand mal seizures. (Tr. 311). Plaintiff's mother reported each seizure lasted two to three minutes and caused Plaintiff to roll on the floor. (*Id*.). Plaintiff was alert but weak, slightly tachycardic, with a slight bite mark on his tongue and slight laceration on his upper lip. (Tr. 313; 315). He was admitted for observation and later observed to be lethargic, weak, and have an altered level of consciousness. (Tr. 315-17). Plaintiff was discharged from Parkview on February 19, 2019, and transferred for evaluation by Dr. Bultemeyer at Lutheran Hospital. (Tr. 348-350). Dr. Bultemeyer observed Plaintiff's baseline seizure frequency is every four to six weeks, and that after the February 18, 2019, cluster of seizures, he had one additional seizure at Parkview. (Tr. 348).

On July 18, 2012, when Plaintiff was eleven years old, he presented to epileptologist Prakash Kotagal, M.D., at the Cleveland Clinic Neurological Institute, with recurrent, uncontrolled seizures. (Tr. 433). Plaintiff had previously undergone surgery to implant a vagus nerve stimulator (VNS) on December 9, 2011, and Plaintiff's mother reported he was currently experiencing weekly seizures lasting one to three minutes and occasional cluster seizures. (Tr. 441). After a single episode seizure, Plaintiff was dazed, groggy, but able to get up "after a few hours" and return to school. (*Id*.). After cluster seizures and administration of Ativan, Plaintiff slept longer, had

impaired memory, and was irritable. (Tr. 441-42). Plaintiff was admitted to the pediatric epilepsy monitoring unit from July 19 to July 23, 2012, by Elaine Wyllie, M.D. (Tr. 430-38). He was subject to continuous video EEG2 monitoring and underwent magnetoencephalogram imaging. (Tr. 431). Plaintiff was diagnosed with medically refractory epilepsy with seizures occurring almost exclusively during early morning sleep. (Tr. 437). He was observed to have difficulties with fine motor skills and visual perception. (Tr. 436). Dr. Wyllie opined Plaintiff was not a candidate for epilepsy surgery based on the test and imaging results. (Tr. 438). His VNS was restarted prior to discharge and the dosage and formulation of Depakote was adjusted. (*Id*.). During a follow up appointment on August 31, 2012, Plaintiff reported side effects of tiredness and difficulty waking in the morning. (Tr. 405-406). Dr. Kotagal opined Plaintiff's improvement in seizures came at the expense of "excessive" daytime tiredness, and adjusted Plaintiff's medications. (Tr. 406).

Plaintiff was next evaluated at Cleveland Clinic on June 2, 2017, when he was sixteen years old. (Tr. 398-402). His family reported increased seizure activity since 2016, with little change even after replacement of his VNS on October 9, 2015. (Tr. 401; 399; 404). Plaintiff's family reported that after seizures, Plaintiff was not "with it," felt sleepy, and was "not very" communicative. (Tr. 399). His other symptoms included weight gain, inappropriately laughing, daytime sleepiness, declining academic performance, and being slow to respond. (*Id*.).

Plaintiff was admitted to the pediatric epilepsy monitoring unit from June 2 to June 6, 2017, and again underwent continuous video EEG. (Tr. 368). Dr. Wyllie observed Plaintiff experienced three types of seizures. Myoclonic seizures, involving a quick grunt with quick head jerk backward, occurring two to three times per day during the day. (Tr. 370; 399).  Plaintiff also experienced myoclonic seizures evolving to generalized tonic clonic seizures, involving a quick grunt with head back, whole body stiffened, clonic jerking "all over," thrashing movements of the upper body,

6

sometimes with face turning blue, tongue bite, and urinary incontinence, and sometimes causing
Plaintiff to fall out of bed. (Tr. 370; 399). These seizures occurred once per week, in the early
morning hours while Plaintiff slept, and lasted about two minutes. (Tr. 370; 399). Following this
type of seizure, Plaintiff might get up, feel confused, wander around, and take off his clothing. (Tr.
399). Dr. Wyllie also observed a new type of seizure, involving staring with unresponsiveness for
five to ten seconds, three to four times per day. (Tr. 370). Dr. Kotagal opined Plaintiff was not a
candidate for resective epilepsy surgery and adjusted his medications, adding Banzel. (Tr. 396-97;
368). He opined Depakote had not been successful in controlling Plaintiff's seizures and noted
Romberg test of Plaintiff's balance was mildly positive. (Tr. 401).

Social worker Samantha Juhn, LISW, met with Plaintiff and his parents prior to discharge
on June 6, 2017. (Tr. 389-92). Juhn observed Plaintiff's affect was flat and he provided brief
answers to questions, including often answering with "I don't know" or "I'm not really sure." (Tr.
391). She opined Plaintiff's attention, focus, and memory were poor, and that he was "somewhat
difficult" to engage in discussion. (Tr. 391-92). Juhn summarized that Plaintiff required some
assistance with activities of daily living and frequent prompting to complete certain tasks. (Tr.
392). Plaintiff's discharge instructions included a directive that he should not drive. (Tr. 397). On
October 20, 2017, Dr. Kotagal observed Plaintiff's seizures were better controlled after the
addition of Banzel to his medication regimen, though he still had breakthrough grand mal seizures
when his sleep/wake schedule was disrupted. (Tr. 358-59; 364).

Plaintiff was a student at Northwest Allen County Schools. He underwent a
psychoeducation evaluation by school psychologist Margaret A. Zartman-Radike on March 24,
2017, and April 12, 2017, when he was age sixteen and in tenth grade. (Tr. 704-713).
Zartman-Radike reported Plaintiff had been absent twenty-seven days of the school year due to

seizure activity and recovery time, and that he received biweekly homebound academic instruction to address frequent absences. (Tr. 705; 712). Plaintiff's full scale IQ as measured by the WAIS-IV was 66; verbal comprehension 72; perceptual reasoning 73; working memory 71; and processing speed 68. (Tr. 708-709). The results placed Plaintiff in the mildly mentally handicapped range of intelligence and processing speed. (Tr. 712). Plaintiff's auditory short term, visual short term, and auditory working memory were in the borderline range and Zartman-Radike opined his visual working memory, at the lower limits of the mildly mentally handicapped range, was Plaintiff's "greatest weakness." (*Id*.). She recommended Plaintiff's special education case conference committee discuss if Plaintiff met the criteria for mild cognitive disability given the declines in his cognitive, memory, and processing skills. (Tr. 713).

Plaintiff was age eighteen and in twelfth grade during the 2018-2019 school year. (Tr. 671). He qualified for special education services based on primary disability Other Health Impairment and secondary disabilities Mild Cognitive Disability and Language Impairment. (Tr. 673). On October 12, 2018, he had earned twenty-five of the forty credits needed to graduate with a general diploma. (Tr. 682). One of Plaintiff's teachers opined Plaintiff was unable to keep up with the fast pace of the classroom and "must be walked through every step of nearly every task." (Tr. 668). Another teacher observed Plaintiff was easily distracted by peers, needed frequent redirection from a classroom assistant, and "constantly" needed instructions repeated. (Tr. 667). The committee reported Plaintiff had difficulty remembering what was needed for each class and relied on staff to remind him of upcoming assignments. (Tr. 665). Plaintiff was frequently absent due to seizure activity. (Tr. 669). His grades were poor and his GPA was 1.61. (Tr. 714-16).

At the Rehabilitation Hospital of Indiana, Plaintiff underwent a neurovocational evaluation by neuropsychologist Edmund Haskins, Ph.D., on March 5, 2018. (Tr. 267-74). Dr. Haskins

8

observed Plaintiff's history was significant for grand mal seizures dating back to age eight, which

occur "on average once a month or so." (Tr. 268). Plaintiff's effort and persistence during testing

was "good" and the evaluation results were deemed valid. (Tr. 269). Plaintiff's full scale IQ as

measured by the WAIS-IV was 71, in the borderline range; verbal comprehension 78; perceptual

reasoning 79; working memory 74; and processing speed 68. (*Id*.). Dr. Haskins opined in summary

that Plaintiff was severely impaired in memory, which was "likely to be his most significant

obstacle." (Tr. 272). Other cognitive measures indicated mild to moderate impairments with

attention and visual spatial skills, and Plaintiff's executive functioning was in the average range.

(*Id*.). Dr. Haskins opined Plaintiff would have severe difficulty with complex tasks and activities

such as residential tasks, transportation, and money management. (Tr. 271). He opined Plaintiff

was functionally impaired due to the inability to analyze or solve problems, weigh alternatives,

make decisions, foresee consequences, maintain focus, sustain attention, and sustain productivity or

quality of work. (Tr. 272). Further, he opined that Plaintiff had limited endurance. (*Id*.). Dr.

Haskins opined Plaintiff would "possibly" need above-average supervision. (Tr. 273).

     In a monthly progress summary dated April 2019, Vocational Rehabilitation Services

employment specialist Jen Coyne performed a situational assessment at Plaintiff's workplace, the

TinCaps baseball stadium, where his duties were to set up, maintain, and take down an ice cream

station, use the cash register, prepare food, and communicate with customers. (Tr. 554). She

observed Plaintiff did "not like" working the cash register and was "shy" around customers. (*Id*.).

Coyne provided Plaintiff "tips and skills" to help him communicate with customers and alleviate

his anxiety around the task. (Tr. 555). In her May 2019 report, Coyne observed Plaintiff completes

"all duties required." (Tr. 556). She noted her next steps were to "provide support while he is

working" and to communicate with Plaintiff's supervisor when needed. (*Id*.).

Plaintiff received recreational therapy services through the Indiana Bureau of Developmental Disabilities Services (BDDS) starting in May 2018. (Tr. 659). In quarterly reports dated November 4, 2018, February 4, 2019, and May 4, 2019, therapist Lindsay Smith observed Plaintiff sometimes needed encouragement to make decisions on his own. (Tr. 660; 657; 654). His goals were to increase independence and improve social connection. (Tr. 659). Plaintiff has received Medicaid waiver services since October 1, 2019. (Tr. 613; 625). In an initial interview dated February 21, 2017, Plaintiff reported becoming aggravated easily, having been to Parkview Behavioral Health ("PBH"), and having difficulty understanding consequences because his aggravation and frustration brought on seizures. (Tr. 629). He reported he can make his basic needs known but gets overwhelmed easily. (Tr. 631).

An Individualized Support Plan including Seizure Risk Plan was developed for Plaintiff on July 29, 2019. (Tr. 586-612). Plaintiff reported he could be in the community independently but could not be alone at home while sleeping at night due to his seizures. (Tr. 592; 594). He wore a movement monitor that alerted his mother of seizure activity, but it was broken and needed to be replaced. (Tr. 594; 537). Plaintiff reported his family was considering installing a safety gate at the top of a staircase after he had fallen down the stairs during a seizure. (Tr. 592). Plaintiff's mother reported he could be gullible with others and did not always use reasonable judgment in terms of safety. (Tr. 594). Plaintiff reported that without a reminder to take his daily medications, he could not remember whether he had already taken them. (Tr. 596).

On June 10, 2019, Plaintiff presented to Dr. Marlene C. Bultemeyer at the Fort Wayne Neurological Center with his mother. (Tr. 890). Dr. Bultemeyer opined a recent cluster of seven seizures may have been due to lack of sleep because of Plaintiff's work schedule. (*Id*.). She completed a physician's report in support of Plaintiff's parents' petition for guardianship of

10

Plaintiff, opining Plaintiff "cannot make his own personal or financial decisions, especially during and after seizures occur." (Tr. 893-94). On October 1, 2019, and on November 13, 2019, Plaintiff's parents called Dr. Bultemeyer's office to report increased seizure activity and to request Plaintiff's VNS be checked. (Tr. 889; 886). On November 21, 2019, Plaintiff reported having seizures about every two weeks "or slightly less," causing him to fall out of bed. (Tr. 881). He had also had one seizure after going to bed late. (*Id*.). Dr. Bultemeyer checked Plaintiff's VNS and observed the battery was low and needed to be replaced. (Tr. 882). On March 2, 2020, Plaintiff reported continued cluster seizures. (Tr. 843). Dr. Bultemeyer noted the seizures occurred back-to-back upon waking and caused Plaintiff to wander and bite his tongue. (Tr. 846).

Plaintiff presented to the Parkview Hospital emergency room on January 30, 2020, after suffering five to six seizures that morning. (Tr. 752; 857). His father reported Plaintiff had recently been more physically active while preparing to play basketball in the Special Olympics. (Tr. 870). Stephen E. Brown, M.D., observed Plaintiff had marked tachycardia and paroxysmal atrial flutter with rapid ventricular response of 150 beats per minute. (Tr. 870; 915; 919). His neurologic evaluation was overall non-focal and non-lateralizing. (Tr. 915). Plaintiff presented to cardiologist James C. Dozier, M.D., on March 3, 2020. (Tr. 903-906). Dr. Dozier observed Plaintiff's VNS was end of life and discussed replacement. (Tr. 906). During follow up on March 18, 2020, Richard F. Otten, M.D., opined the cardiac risk associated with changing Plaintiff's VNS generator was low and acceptable. (Tr. 748). On May 20, 2020, Dr. Dozier observed Plaintiff was experiencing seizures about once a month. (Tr. 898). He performed a surgical procedure to replace Plaintiff's VNS generator. (Tr. 902; 977-78).

Therapist Smith of the Indiana BDDS developed an updated recreational therapy plan on July 1, 2019. (Tr. 831-33). She opined Plaintiff's strengths included flexibility with change, ability

11

to make day-to-day decisions, ability to verbally communicate his wants and needs, and understanding emergency situations and how to respond. (Tr. 831). Smith identified Plaintiff's weaknesses as below average working memory, slow processing time, lack of persistence, and need for modeling of appropriate social skills. (Tr. 831-32). She recommended weekly two-hour recreational therapy sessions and optional group outings on weekends with the goal of increasing Plaintiff's independence and improving his social connection. (Tr. 832).

On May 21, 2020, the Family & Social Services Administration conducted an annual review of Plaintiff's eligibility for Medicaid waiver services. (Tr. 768-80). The reviewer noted Plaintiff could independently prepare himself for his part time job, ask for a ride, or ride his bike to work. (Tr. 775). The reviewer also noted Plaintiff falls often and unexpectedly due to seizures, and that there was a seizure risk plan in place. (Tr. 772). He required reminders to bathe and "hands on" assistance to meet basic standards of grooming, indicating substantial functional limitation in  the area of self-care. (Tr. 774). He required supervision when preparing foods, help with managing money, reminder to take medication, extra time to process information, and repetition and continuous training in learning daily living skills. (Tr. 775-76). Plaintiff's eligibility for services related to developmental disability was renewed. (Tr. 780).

A new Individualized Support Plan for Plaintiff was developed with Plaintiff's contribution on July 14, 2020. (Tr. 781-804). Plaintiff needed one step instructions and to be treated calmly and in a non-confrontational manner. (Tr. 784). His communication skills had improved, but he relied on his parents to facilitate social and leisure activities. (Tr. 795). The identified strategy for improving Plaintiff's social connections was modeling of appropriate social skills. (Tr. 796). He was assigned a behavioral consultant to learn coping and calming skills to deal with anger, regulate his emotions, and de-escalate when needed. (*Id*.). The plan noted Plaintiff "had to go to Parkview

Behavioral in the past." (Tr. 791). Plaintiff reported that using Uber for transportation was an option because he felt he could use it on his own. (Tr. 786). He reported not always recognizing dangerous situations or knowing how to respond appropriately. (Tr. 788). Plaintiff's mother reported Plaintiff had started to engage in repetitious behaviors, such as clapping his hands "non-stop," screaming "out of the blue," and making noises at night. (Tr. 792). Plaintiff began services with Torres Behavioral Health and behavioral consultant Kalah Baer on July 2, 2020. (Tr. 907). Her recommendations included that Plaintiff write in a journal when he is upset, communicate with words to describe his feelings, and refrain from yelling during discussions. (Tr. 908).

During initial review, the state agency found Plaintiff had severe impairments of epilepsy (primary) and neurocognitive disorders (secondary). (Tr. 100). On June 11, 2019, state agency non-examining doctor Ann Lovko, Ph.D., opined Plaintiff's mental residual functional capacity ("RFC") was as follows: mildly limited in ability to interact with others and moderately limited in ability to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage himself. (*Id*.). On May 23, 2019, state agency non-examining doctor J. Sands, M.D., opined Plaintiff's physical RFC included the following restrictions: never climbing ladders, ropes, or scaffolds; occasionally balancing; and avoiding all exposure to working at unprotected heights, operation of motorized vehicles, working around or operating dangerous machinery with moving parts or sharp brakes. (Tr. 102-103).

During reconsideration review, on September 27, 2019, state agency non-examining doctor Jerry Smartt, Jr., M.D., affirmed the prior opinion of Dr. Sands with respect to Plaintiff's physical RFC. (Tr. 116-18). State agency non-examining doctor Ken Lovko, Ph.D., affirmed the prior opinion of Dr. Ann Lovko with respect to Plaintiff's mental RFC, adding that Plaintiff was

13

moderately limited in his ability to sustain an ordinary routine without special supervision. (Tr. 118-20).

At the hearing before the ALJ, Plaintiff testified that he lives in "Huntertown or Fort Wayne." (Tr. 37; 30). He does not have a driver's license and stated that he graduated from high school.[2] (Id.). He is part of a bowling league, helps elementary-age children at his church, plays basketball, and can ride his bike and take walks by himself. (Tr. 43-44; 46). His parents remind him to take his medications and drive him places. (Tr. 47). Plaintiff testified he had done odd jobs and worked for one semester in his school cafeteria. (Tr. 39-41). He had volunteered as a stocker at the ReStore, where he described having problems "just with the people [he] was around." (Tr. 41-42). Plaintiff testified he worked for the local baseball team, the TinCaps, where his job had been to sell Dippin' Dots ice cream. (Tr. 38-39). He stated he used the cash register but "not all the time" because he's "not very good with that type of thing." (Tr. 39). His job coach helped him apply for the TinCaps job and his family had helped him apply for other jobs. (Tr. 40; 38).

Plaintiff's mother attributed Plaintiff's success working at the TinCaps to the structure and training his job coach provided and testified that Plaintiff did not use the cash register there at all. (Tr. 56). She believed Plaintiff would have problems with attendance if he worked full-time and recounted how Plaintiff suffered a seizure after working four, seven-hour shifts in a row. (Tr. 49-50). She said his grand mal seizures are "very violent and very hard." (Tr. 54). During seizures, Plaintiff wanders, has fallen down the stairs and broken his kneecap, chipped his tooth, and hurt his shoulder falling out of bed. (Tr. 52; 54). He turns blue or grey because his oxygen "plummets." (Tr.

---

[2] Records include Plaintiff's predicted date of graduation, but do not indicate Plaintiff earned the credits necessary to graduate with a diploma or completed his education beyond eleventh grade. (Tr. 98; 225; 564; 671; 684).

54). Jennifer explained Plaintiff is "down for a couple days" after seizures. (Tr. 50; 53). She said Plaintiff never goes anywhere by himself and recounted an incident when Plaintiff was home alone and accidentally "flooded my whole kitchen" after getting sidetracked while washing dishes and leaving the water running for a half hour. (Tr. 53; 51). Plaintiff's mother testified Plaintiff has bad days and absent seizures that can cause him to be "angry and upset." (Tr. 52). On one occasion, she had to call the police and take him to Parkview Behavioral Health. (Tr. 50).

In response to a hypothetical posed by the ALJ, VE Bond opined that an individual with the capacity to perform work at all exertional levels, but who: can never climb ladders, ropes, or scaffolds; can occasionally balance and climb stairs; must avoid working at unprotected heights, operating motorized vehicles, and working around or operating dangerous machinery with moving parts or sharp brakes; can understand, carry out, and remember simple, routine, and repetitive tasks with no production-rate pace; can meet production requirements if flexible and goal-oriented; can perform work requiring only simple, work-related decision making; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments for eight-hour work days within the confines of normal work breaks and lunch periods; can respond appropriately to predictable, routine changes in the work place; and can have brief and superficial interaction with supervisors and co-workers and occasional interaction with the general public, could perform work as a hand packer, industrial cleaner, or laundry laborer. (Tr. 59-60). Bond testified employer tolerance for absenteeism "should not exceed two days per month." (Tr. 60). He stated that if the individual required simple reminders to stay on task more than once per hour, the level of supervision needed would exceed what is tolerated by employers. (Tr. 61).

In support of remand, Plaintiff argues that the ALJ failed to properly analyze the applicable listings at Step Three. The sequential evaluation process required the ALJ to consider the medical

15

severity of Plaintiff's impairments and, if his impairments met or medically equaled a listing and

met the duration requirement, to find Plaintiff disabled at Step Three. *See* 20 C.F.R.

404.1520(a)(4)(iii); (d); SSR 17-2p. Plaintiff's severe, medically determinable impairments are

epilepsy, ADHD, and cognitive disorder. (Tr. 12). The ALJ considered Plaintiff's epilepsy under

listing 11.02 of 20 C.F.R. part 404, subpart P, Appendix 1[3], as follows:

> The undersigned has considered Listing 11.02 (epilepsy). To meet this Listing, one
> must have generalized tonic-clonic seizures, occurring at least once a month for
> three consecutive months, despite adherence to treatment; or dyscognitive seizures
> occurring at least once a week for at least three consecutive months despite
> adherence to treatment; or generalized tonic-clonic seizures occurring at least once
> every two months for at least four consecutive months and a marked limitation in
> any of the four mental health domains. Records from neurology consistently note that
> the claimant has seizures every 4-6 weeks. He has had some cluster seizures;
> however, only on occasion. His seizures are predominantly in the morning, and he
> has no more after that. Furthermore, the records supports no more than moderate
> mental health limitations, with no marked or extreme limitations. Therefore, after
> review of the entire record, the undersigned finds that the claimant does not meet
> and/or equal the above Listing.

The record shows that, with respect to the frequency of Plaintiff's seizures, treating

neurologist Dr. Bultemeyer characterized seizures every four to six weeks as Plaintiff's "baseline."

(Tr. 348). When Plaintiff's family reported increases in his seizure frequency, Dr. Bultemeyer

opined the increases were related to sleep cycle disruption and lack of sleep. (Tr. 537; 890; 889;

886; 881). When Plaintiff was under continuous observation at Cleveland Clinic between June 2,

---

[3] Listing 11.02 reads, in relevant part, as follows: Epilepsy documented by a detailed
description of a typical seizure and characterized by A, B, C, or D: (A) Generalized tonic-clonic
seizures, occurring at least once a month for at least 3 consecutive months despite adherence to
prescribed treatment; or…(C) Generalized tonic-clonic seizures, occurring at least once every 2
months for at least 4 consecutive months despite adherence to prescribed treatment; and a marked
limitation in one of the following: (1) Physical functioning; or (2) Understanding, remembering, or
applying information; or (3) Interacting with others; or (4) Concentrating, persisting, or
maintaining pace; or (5) Adapting or managing oneself.

2017, and June 5, 2017, he experienced cluster seizures every day. (Tr. 387; 368). He experienced seventy-seven "brief generalized myoclonic seizures," or one to ten seizures per hour. (Tr. 368). Dr. Wyllie observed the frequency of the myoclonic seizures is two to three times per day and occur any time of the day. (Tr. 399). She also noted Plaintiff's myoclonic seizures can evolve to generalized tonic clonic type seizures, which occurs "around" once per week. (Tr. 370; 399). On September 6, 2018, Dr. Bultemeyer noted Plaintiff reported a single, generalized tonic clonic seizure had occurred during the school day and that he had been found on the bathroom floor. (Tr. 530).

The Commissioner has not even acknowledged in her response that the ALJ ignored a wide array of evidence which demonstrated that Plaintiff has "generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment" as required to meet Listing 11.02A. The Commissioner merely states that "[t]he ALJ found that Plaintiff had seizures every 4-6 weeks, only occasionally as cluster seizures." Yes, this is what the ALJ found.  The question the Commissioner should have answered is whether the ALJ's finding was underlined correct, considering the vast amount of evidence in the record regarding Plaintiff's frequent seizure activity, which was painstakingly laid out by Plaintiff in his opening brief.

This Court agrees with Plaintiff that the ALJ's finding that Plaintiff's epilepsy did not meet Listing 11.02 was conclusory, as well as likely incorrect. The ALJ's "analysis" lacked consideration of relevant evidence indicating that, while seizures every four to six weeks may be Plaintiff's baseline, his treating neurologists have observed increased seizure frequency due to environmental stressors and during periods of close observation and have observed Plaintiff's seizures do not occur exclusively in the morning.  This Court has reviewed the evidence carefully and finds that remand is warranted so that the ALJ may more carefully consider whether Plaintiff

meets Listing 11.02

Plaintiff has also asserted that he meets Listing 12.11, which concerns neurodevelopmental disorders. This Listing has two sets of criteria, the A criteria, and the B criteria, which both must be met to meet the Listing. The A criteria are:

> Medical documentation of the requirements of paragraph 1, 2, or 3:
> 1. One or both of the following:
>    a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
>    b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
> 2. Significant difficulties learning and using academic skills; or
> 3. Recurrent motor movement or vocalization.

Neither the ALJ nor the Commissioner assert that Plaintiff does not meet the A criteria, which is appropriate since Plaintiff has long been diagnosed with ADHD. However, the ALJ found that Plaintiff did not meet the B criteria, which are as follows:

> Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2).
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4).

In evaluating the B criteria, the ALJ stated:

> In understanding, remembering or applying information, the claimant has a moderate limitation. The record shows that the claimant is capable of communicating his wants and needs verbally; however, written instructions for tasks work better for him. He needs a planner to stay organized. Mental status evaluations showed that his orientation was intact in all spheres. There was no memory disturbance evident. He had average intellect, per his vocabulary and fluency, and he had adequate retention and recall of new information (Exhibit 2F).
>
> In interacting with others, the claimant has a moderate limitation. The claimant presented as friendly and cooperative; however, somewhat shy. He lives at home, and his parents have to help him by driving him places and with reminders for

certain daily activities. He is capable of making friends, and he hangs out with his brothers. He is a greeter at his church, and he volunteers at vacation bible school. The records noted that his communication skills with others were improving.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The record shows that he is capable of maintaining attention, and records showed that while working, he was able to complete all tasks given to him. While working, records from vocational rehabilitation noted that his performance was somewhat variable. He had mild problems with concentration and attention. He clocked in and out timely at work. He moved quickly and took his tasks seriously.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The record shows that the claimant is not capable of driving due to his seizure activity. However, his parents take him where he needs to go, and he is capable of using Uber. He is able to perform most of his activities of daily living independently. He does some chores around the house, but he reported that his mother does most everything. He likes to bowl and he likes to play video games. He should avoid stress, as it was noted that stress triggered seizures.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 13-14).

With respect to "understanding, remembering or applying information", Listing 12.00E1 explains that:

This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

The Court notes that the ALJ cites to Exhibit 12F as her support for her finding that Plaintiff did not have a marked limitation in understanding, remembering or applying information. Exhibit 12F (Tr. 275-297) is a request, dated March 21, 2019, to the Fawver Wellness Clinic for "copies of all medical records, mental health exams, and progress notes for 1/2018 to present." The Progress

19

Notes in Exhibit 12F were prepared by Nurse Practitioner Jayne S, Biehl on January 2, 2018.  On

that date Plaintiff was seen regarding his treatment plan for ADHD and "family conflict". (Tr. 281).

On page 13 of Exhibit 12F, in the section titled "mental status examination" NP Biehl notes: "no

memory disturbances evident, average intellect per vocabulary and fluency and adequate retention

and recall of new information." (Tr. 287). This statement is obviously based on NP Biehl's

interaction with Plaintiff on that specific date, and not based on any sort of testing or long-term

familiarity with Plaintiff's mental functioning.

      In contrast, the record shows that Plaintiff had received special education services in

school partly due to "mild cognitive disability" and "language impairment". (Tr. 673). Plaintiff's

teachers reported that Plaintiff was unable to keep up with the pace of the classroom, was easily

distracted, needed frequent redirection, and constantly needed instructions repeated. (Tr. 667,

668). Plaintiff also was unable to remember what was needed for his classes and relied on staff to

remind him of upcoming assignments. (Tr. 665).  Plaintiff had a GPA of 1.61. (Tr. 714-16). In

March of 2018, Plaintiff underwent a neurovocational evaluation, where his full scale IQ as

measured by the WAIS-IV was 71; verbal comprehension was 78; perceptual reasoning was 79;

working memory was 74; and processing speed was 68. (Tr. 269).  It was also noted that Plaintiff

was severely impaired in memory. (Tr. 272).  Dr. Haskins opined that Plaintiff was functionally

impaired due to inability to analyze or solve problems, among other things, and stated that Plaintiff

would possibly need above-average supervision. (Tr 272, 273). Additionally Plaintiff's Medicaid

waiver assessment included the opinion that he required one-step task instruction, repetition of

instructions, written instructions, and extra time to process information. (Tr. 13, 269; 665-671; 713;

776; 778).

      The ALJ failed to discuss any of this evidence, choosing instead to cherry-pick one

sentence out of an NP's progress notes, which notes were not even based on testing. Again, the Commissioner offers no real defense of the ALJ's opinion, merely stating that "substantial evidence supports the ALJ's finding that Plaintiff had no more than moderate limitations in any of those areas of functioning." This Court disagrees. Clearly, the evidence relied upon by the ALJ is far from substantial and barely qualifies as evidence.

Section 12.00F describes what qualifies as a "marked" or "extreme" limitation.

d.      Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e.      Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

If the ALJ had analyzed all of the evidence, she could have easily found that Plaintiff has at least a marked (*i.e.* serious) limitation in his ability to independently, appropriately, effectively, and on a sustained basis understand, remember or apply information, which typically involves, per the examples in the regulations," recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." Thus, remand is appropriate so that the ALJ may properly analyze the evidence regarding this domain.

With respect to interacting with others Listing 12.00E2 states that:

This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

In finding that Plaintiff had only a moderate limitation in interacting with others, the ALJ did not indicate which evidence she relied upon, but stated that Plaintiff "presented" as friendly,

cooperative, and somewhat shy. Thus it appears that perhaps the ALJ was basing her decision on

her own interaction with Plaintiff at a telephone hearing[4]. This hearing, on September 14, 2020,

lasted less than an hour and Plaintiff only testified for a small part of the hearing.  Plaintiff's ability

to be pleasant and cooperative for a short telephonic hearing, during which his mother was present

and was held in the comfort of his own home, is not evidence that he has the "abilities to relate to

and work with supervisors, co-workers, and the public". The ALJ also stated that "records" noted

that his communication skills with others were improving, although the ALJ did not specify which

records she was relying upon.  In any event, an improvement in a skill is meaningless without any

indication of what the skill level was before the improvement, and does not support a finding that a

claimant can communicate effectively.

The record shows Plaintiff likely has at least a marked limitations in this domain.  Plaintiff

receives recreational therapy through the Bureau of Developmental Disabilities to facilitate his

engagement with peers via group outings, and he required social modeling of appropriate social

interactions. (Tr. 796; 819; 832). Plaintiff becomes easily angered and explosive, to the point that

his family once required police intervention and treatment at Parkview Behavioral Hospital, and he

engages in behavioral therapy to help him develop emotional regulation skills. (Tr. 50; 52; 694;

796; 834). He also has problems interacting with his own family, as evidenced by Exhibit 12F,

where it was noted that Plaintiff's treatment plan encompassed help with "family conflict". Clearly,

Plaintiff's ability to function in this area independently, appropriately, effectively, and on a

sustained basis is quite limited, which could support a finding of a marked impairment in this area.

The only areas where Plaintiff has had any sort of success are areas where he has had a great deal

---

[4] Due to extraordinary circumstances presented by COVID-19, the ALJ conducted the
hearing over the telephone. (Tr. 30).

of support, mainly by his family and church.  The ALJ noted that Plaintiff was a greeter at church, however this "job" is for a very short time (possibly half an hour), is usually done in pairs, and simply involves standing by the door and smiling.  Likewise, volunteering at vacation Bible school would not take more than a few hours a day during one week, in a supportive environment. Thus, the Court will remand for a further analysis of this domain.

> With respect to concentrating, persisting or maintaining pace, Listing 12.00E3 states that:
>
> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

Again, without citation to the record, the ALJ stated that Plaintiff "is capable of maintaining attention" and while working "was able to complete all tasks given to him".  Referring to records from "vocational rehabilitation" the ALJ noted that Plaintiff's performance was "somewhat variable" and that he had "mild problems with concentration and attention."  As noted above, Plaintiff had a seasonal job (for one season) with the TinCaps, a local ballpark, selling ice cream. The ALJ misstated the record regarding this job as Plaintiff was unable to use the cash register and thus did not complete all tasks given to him as she stated. Plaintiff's mother explained that "he works with CORE, who provides a lot of structure on how to do a job, and that's why he was successful at the TinCaps because they worked with him for a few weeks just so he can understand what he needed to do..."   Plaintiff's mother also explained that Plaintiff cannot work full-time because even working 7 hours a day for four days "takes a lot out of him" and then "we see an intake in seizures."  Plaintiff then requires several days to recuperate from his seizures causing him

23

to miss work.  Plaintiff's mother stated that the TinCaps accommodated Plaintiff's absences "because they work with our vocational rehab very well." (Tr. 50). Moreover, Plaintiff testified that when he volunteered at the ReStore (a non-profit used-furniture store) he had problems with the people he was around. (Tr. 42). Again, as the ALJ failed to analyze the relevant evidence, the Court will remand for a further evaluation of this domain.

> With respect to adapting and managing oneself, 12.00E4 states:
>
> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

In her discussion of this domain the ALJ acknowledged that Plaintiff is unable to drive due to his seizures, but notes that he is capable of using Uber, which has nothing to do with regulating emotions or controlling behavior in a work-setting.  The ALJ claims, without citation to the record, that Plaintiff is mostly independent in self-care. However, the record shows that Plaintiff sees a behavior therapist once a week (Tr. 50) and also sees a recreational therapist once a week (Tr. 51).  His mother also testified that he has to be reminded to take his medicine, take showers, use deodorant and "a lot of self-care reminder". (Tr. 52).  The ALJ found that Plaintiff had a "moderate" limitation in this domain which means "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  Whereas a "marked" limitation would indicate functioning is seriously limited. This court finds that the evidence supports that Plaintiff likely has at least a marked limitation in this area.  The record shows that Plaintiff is unable to regulate his emotions on a sustained basis, hence the need for two weekly therapists. Also there is no indication in the record that Plaintiff can, on a sustained basis, control his behavior or maintain

24

his well-being in a work setting.  While Plaintiff has had limited success at his TinCaps job and has done some volunteer activities at church, these activities have all been structured to accommodate his limitations in a kind, supportive way.  The ALJ and the Commissioner have both failed to point to any evidence that, at this time, Plaintiff has the skills necessary to adapt and manage himself in a full-time work environment.  Thus remand is required so that the ALJ can properly consider all of the evidence presented regarding Plaintiff's limitations in all four of the domains discussed above, as an appropriate analysis of the evidence could very well lead to the conclusion that Plaintiff meets Listing 12.11 and is entitled to benefits.

Next, Plaintiff argues that he meets Listing 12.05B which concerns intellectual disorders. This Listing requires significantly subaverage general intellectual functioning evidenced full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or a full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence. The record shows that Plaintiff had an IQ assessment in 2017 and in 2018.  The 2017 test was performed by Plaintiff's school psychologist when he was 16.  His full-scale IQ as measured by the WAIS-IV was 66, verbal comprehension was 72, perceptual reasoning was 73, working memory was 71, and processing speed was 68.  In 2018, Plaintiff was tested at the Rehabilitation Hospital of Indiana and his full-scale IQ as measured by the WAIS-IV was 71, verbal comprehension was 78, perceptual reasoning was 79, working memory was 74, and processing speed was 68.  Thus, although Plaintiff's 2017 scores would have meet the Listing criteria (assuming the testing was performed in compliance with the applicable regulations), his 2018 scores look a bit too high.  However, as indicated in POMS DI 24583.055F2, there is a "practice effect" that should be accounted for when a person is retested.

25

"The practice effect refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument." *Id*. Thus, the Court will remand on this issue so that the ALJ can explore whether the second test accurately measured Plaintiff's IQ.

Plaintiff also argues that the ALJ failed to properly formulate the mental RFC. A claimant's RFC is "an assessment of [his] ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, meaning 8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996). The ALJ must evaluate RFC on a "function-by function basis…considering functional limitations and restrictions resulting from medically determinable impairments or a combination of impairments, including symptoms." *Id*. The ALJ may not dismiss a line of evidence contrary to her ruling. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). And though the ALJ is not required to address every piece of evidence or testimony present, she must provide a logical bridge between the evidence and her conclusions. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Here, the ALJ failed to build a logical bridge between the medical evidence and Plaintiff's assigned mental RFC, which the ALJ assessed as allowing Plaintiff to perform work that required a person to "understand, carry out, and remember simple, routine, and repetitive tasks with no production-rate pace; can meet production requirements if flexible and goal-oriented; can perform work requiring only simple, work-related decision making; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments for eight-hour work days within the confines of normal work breaks and lunch periods; can respond appropriately to predictable, routine changes in the work place; and can have brief and superficial interaction with supervisors and co-workers and occasional interaction with the general public. The frequency

26

of seizures would not cause the claimant to miss more than two days of work per month" (Tr. 14).

First, the ALJ noted Plaintiff's impairments do not preclude "all work activity." (Tr. 16). When an ALJ considers work history as evidence of RFC, as was the case here, the ALJ "must consider whether the work was done under special circumstances or accommodations," including if the claimant "required and received special assistance from other employees in performing [] work" or was "able to work only because of specially arranged circumstances, for example, other persons helped [the claimant] prepare for and get to and from [] work." 20 C.F.R. § 416.973(c).[5] The record is clear that Plaintiff can perform some work activity, albeit not at significant gainful activity levels, not on a regular and continuing basis, and not in a competitive work environment. This is evidenced by Plaintiff's reliance on family members and a job coach to help him identify, apply for, and maintain a job at the TinCaps. (Tr. 40; 222; 554-72). He performed work activity on a seasonal, part time basis with the support of a job coach, relied on his family members to transport him to and from the job, and was unable or unwilling to use the cash register though it was an essential job duty. (Tr. 56; 198; 271; 274; 560; 674). When Plaintiff worked shifts at ball games on four consecutive days, he experienced sleep disruption and increased seizure activity,

---

[5] (c) *If your work is done under special conditions*. …If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity…. However, work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level. Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which (1) You required and received special assistance from other employees in performing your work; (2) You were allowed to work irregular hours or take frequent rest periods; (3) You were provided with special equipment or were assigned work especially suited to your impairment; (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work; (5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or (6) You were given the opportunity to work, despite your impairment, because of family relationship, past association with your employer, or your employer's concern for your welfare.

which his mother testified kept him "down for a couple days." (Tr. 49-50; 890; 222).

Clearly the ALJ impermissibly drew conclusions about Plaintiff's ability to sustain full time work activity based on part time, accommodated work. *Lanigan v. Berryhill*, 865 F.3d 558, 565-66 (7th Cir. 2017). "An ALJ may not rely on a claimant's ability to perform part-time work to conclude that a claimant can perform full time work." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010). Here, the ALJ credited Plaintiff's part time work activity as a factor in support of her finding that Plaintiff was not disabled, failing to consider the special conditions that allow Plaintiff to perform part time work activity and, in effect, holding Plaintiff's work activity against him. (Tr. 27).

Additionally, POMS DI 24510.061 directs that evaluation of mental functioning "must include consideration of [a claimant's] ability to maintain adequate mental functioning throughout a full workday."  In appropriate cases, the inability to sustain a forty-hour workweek is an RFC finding. POMS DI 24510.057. Plaintiff presents such an appropriate case, yet the ALJ failed to apply these principles. Accordingly, the hypothetical she posed to the vocational expert was flawed, undermining her reliance on the vocational testimony and contributing to an erroneous Step Five denial. Thus remand is required on this issue.

Next, Plaintiff argues that the ALJ failed to properly evaluate his symptom testimony. The ALJ concluded Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision," attributing the inconsistency to there being "nothing in the objective evidence to support a finding that the claimant would be unable to perform any work activity." (Tr. 16). The first error in the ALJ's symptom testimony evaluation is that it is

28

justified by meaningless boilerplate, which courts have repeatedly criticized. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018). This particular brand of boilerplate is inconsistent with SSA regulations concerning the evaluation of symptom testimony, though Plaintiff acknowledges it is not an automatic ground for remand. *Minger v. Berryhill*, 306 F. Supp. 3d 865, 871 (N.D. Ill. 2018); *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016). SSA regulations require an ALJ to determine whether allegations "can reasonably be accepted as consistent with objective medical signs and laboratory findings and other findings" to decide how a claimant's symptoms affect his ability to work. 20 C.F.R. 404.1429 and 416.929(a). Accordingly, the second error in the ALJ's evaluation lies in the hyperbolic standards she demanded in this case – that Plaintiff's statements were not "entirely consistent" and that there was "nothing in the objective evidence" to support that Plaintiff is unable to perform "any work activity" – which are more rigorous than what is required. SSR 96-8p, 1996 WL 374184 (July 2, 1996). Therefore, in addition to all the errors noted above, remand is also required so that the ALJ may properly evaluate Plaintiff's symptom testimony.

Conclusion

On the basis of the foregoing, the decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.


 Entered: January 24, 2022.


s/ William C. Lee
William C. Lee, Judge
United States District Court